IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:10-CV-35-BO

| | |
|---|---|
| Lisa Whitehead,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>MICHAEL J. ASTRUE,  )<br>Commissioner of Social Security,  )<br>)<br>Defendant.  )<br>_____ ) | O R D E R |

This matter is before the Court on both Plaintiff and the Government's Motion for Judgment on the Pleadings. The Government's Motion is GRANTED.

## I.  FACTS

Plaintiff was born in June 1967 and has formerly worked as a short order cook, baby sitter, and a home health aide (Tr. 30-34, 124-26, 128). Plaintiff alleges that on December 28, 2001[1] she became unable to work due to lumbar degenerative disc disease, carpal tunnel syndrome, degenerative joint disease in her knees, chronic obstructive pulmonary disease (COPD), obesity, sleep apnea, hypertension, major depressive disorder, post traumatic stress disorder (PTSD), and personality disorder (Tr. 124); Plaintiff's Brief, p. 3-4.

### A. Medical Evidence Relating to Plaintiff's Physical Ailments

On May 23, 2006, Plaintiff returned to Pitt County Memorial Hospital (Pitt County)

---

[1] Plaintiff filed a previous application for benefits that was denied by an ALJ on May, 8, 2006, with no further appeal (Tr. 120). Plaintiff's current claim for benefits thus does not cover any time on or before May 8, 2006.

Pain Center for lower back pain and pain in both her legs (Tr. 161-62). She is 5' 6" and weighed approximately 320 pounds. Dr. Raymond Minard, M.D. noted that she had degenerative changes from L1 through L4 without stenosis or foraminal compromise (Tr. 161). On physical examination, Plaintiff had no pain while sitting, was alert and oriented, had normal results with straight leg testing, had some knee pain but no acute weakness on motor testing, and had no dorsi or plantar flexor weakness in her quads or hamstrings (Tr. 161). Dr. Minard strongly recommended exercise on a stationary bike and weight loss, and also increased her dosage for the pain medication, Keppa. Id.

Plaintiff had her next follow-up on July 21, 2006 (Tr. 159-60). Although she still complained of pain, she reported that her medication "maintained her pain control quite nicely" (Tr. 159). Physical examination revealed that she could rise from a seated to a standing position without difficulty, could walk without difficulty, and did not require the use of an assistive device to walk (Tr. 159).

On July 26, 2006, Kristin W. Warren, PA-C, examined Plaintiff (Tr. 205-08). Plaintiff complained of pain in her knees and hands. (Tr. 205-06). Plaintiff's examination revealed, among other things, that her wrists were non-tender, her nerve compression test and Tinel's sign[2] test were negative, her ulnar, median and radial nerves were intact, her grip strength and muscle strength in her wrists and arms were normal or 5/5, and she had no degenerative joint disease in her hand (Tr. 206-08). Examination of her legs showed a limp; mild swelling, crepitation, and effusion in both knees; normal patellar positioning; no hip swelling or tenderness; equal leg length; normal bilateral strength and a full range of motion in her hips; an active but painful range of motion in her knees; and moderate degenerative joint disease in her knees (Tr. 206-08). She was given a knee injection and advised to exercise (Tr. 208).

---

[2] Tinel's sign is used to detect irritation in nerves

On August 11, 2006, Perry Caviness, M.D., performed a Physical Residual Functional Capacity Assessment of Plaintiff's medical records (Tr. 175-82). Dr. Caviness concluded that Plaintiff could perform the functional requirements of a full range medium-level exertional work, minus the restriction of having to avoid concentrated exposures to hazards (Tr. 175-82). Jolene Jean Gracia, M.D., affirmed this assessment on November 1, 2006 (Tr. 210).

On August 23, 2006, PA Warren again examined Plaintiff, specifically noting that Plaintiff experienced "marked improvement" of greater than 50% of her hand and knee symptoms. While she still had swelling in her right knee, she only had only "mild, intermittent pain" and she was able to start walking for exercise (Tr. 201).

On October 6, 2006, Dr. Ira Hardy, II, M.D. of the Center for Scoliosis & Spinal Surgery, PPLC (CSSS) examined Plaintiff (Tr. 332-33). Dr. Hardy found that Plaintiff was in no acute distress; had a slow walk; had +1 reflexes in both knees and ankles; had no objective motor or sensory deficit; had a negative straight leg raising test; had a good range of motion in her hips; had sick space narrowing at L4-L5 and L5-S1; and had "no evidence of instability throughout flexion or extension" (Tr. 332-33). A subsequent October 26, 2006 MRI of Plaintiff's lumbar spine, which was reviewed by Dr. Hardy on February 6, 2007, showed congenital deformity and central canal stenosis of the right L5-S1 joint, moderate central canal stenosis and right neural foraminal narrowing; moderate lower lumbar facet degenerative disease; and simple cystic structures in her ovaries (Tr. 334, 331). Dr. Hardy prescribed no treatment.

The record does not contain further treatment related to Plaintiff's physical impairments until October 9, 2007, when Eric Francke, M.D., of CSSS examined her (Tr. 327-29). Dr. Francke observed that Plaintiff was not in acute distress, had 5/5 strength in both of

3

her legs and throughout all of her lower extremity motor groups, had +2 reflexes in her Achilles and patellar tendons, and intact sensation in all dermatomal distributions (Tr. 328). Dr. Francke advised Plaintiff to quit smoking and about possible back surgery (Tr. 328).

On January 14, 2008, Plaintiff had back surgery at Pitt County. Specifically, the operation was an L5-S1 laminectomy and right-sided facetectomy and transforaminal lumbar interbody fusion. (Tr. 318-22).

Plaintiff was discharged on January 17, 2008, and she was "doing well with no complaints of leg pain" (Tr. 316). She had some back pain at the surgical site, but her leg pain was resolved, and she had 5/5 strength throughout her lower extremities (Tr. 316). Plaintiff did well with physical therapy, continued to improve, and was discharged with instructions to avoid repetitive bending, twisting, or lifting (Tr. 316).

On a January 29, 2008 follow-up appointment, Plaintiff showed "good strength" in her lower extremities and intact sensation throughout (Tr. 364). Just two weeks after the surgery, Dr. Francke noted that Plaintiff was "doing well from a symptomatic standpoint" (Tr. 364). On February 19, 2008, although Plaintiff reported "some discomfort" in her back when she twists in bed, her leg pain was totally resolved (Tr. 368). On March 18, 2008, Plaintiff reported that she was "doing well" (Tr. 371). She had no pain in her legs, but, due to a recent fall, her back was a "bit sore" (Tr. 371). She reported that her back ached when she first got up in the morning, but that it "resolves quickly" (Tr. 371). On examination, Plaintiff was walking without difficulty (Tr. 371).

Plaintiff visited Dr. Reginald Obi, M.D. on April 16, 2008 for shortness of breath and coughing spells (Tr. 336-37). The doctor noted that Plaintiff smoked a pack of cigarettes daily for 22 years, and "mostly" had her symptoms while she smokes. Dr. Obi advised Plaintiff to quit

smoking and lose weight via dietary discretion and exercise (Tr. 337). Dr. Obi examined Plaintiff again on May 16, 2008, and noted that Plaintiff had ankle pain and had gained 13 pounds in one month due to binge eating, bringing her weight to 287 pounds. (Tr. 343). He prescribed the Dyazide for her pain.

On May 20, 2008, Plaintiff reported that her leg pain was totally resolved. Although she had an intermittent stinging in her back, she said that it was something that "she can live with" (Tr. 375). Dr. Francke noted that she should improve over the next month (Tr. 375). Dr. Obi examined Plaintiff again on July 9, 2008, and she had no new complaints (Tr. 341).

Plaintiff visited Plymouth Primary Care on November 19, 2008. She complained of back pain and a cough. Plaintiff said her pain was "controlled" with pain medication Voltaren, but that the cold weather made her pain worse. (T p. 387). She was prescribed a higher dosage of Voltaren. Plaintiff's December 8, 2008 x-ray of her lumbar spine revealed that the anterior and posterior fusion of her L5-S1 was in proper anatomic alignment; she had minimal degenerative bony changes without disc space narrowing; she had no fractures or bone destruction; and her sacroiliac joints were normal (Tr. 390). Plaintiff returned for follow up on December 16, 2008. She continued to suffer from low back pain, which interfered with her housework. Upon examination, her lower spine had mild tenderness. Plaintiff was prescribed Darvocet in addition to Voltaren. (T p. 386).

On June 23, 2009, Plaintiff visited Dr. Lynn Johnson at the pain clinic at Pitt County Memorial Hospital. She complained of right leg and arm numbness as well as low back pain. The low back pain had increased in severity in the few months prior to this visit. Plaintiff described a throbbing pain that traveled to her lower extremities. She also complained of weakness in her legs. (T pp. 393-399). Plaintiff reported continued use of cigarettes daily and marijuana weekly

(Tr. 395). On examination, Plaintiff was alert and oriented and in no apparent distress; had mild tenderness with no swelling in her back; had negative straight leg raise testing; had 5/5 muscle strength with flexion, extension, abduction, and adduction; had 2/4 reflexes in her legs; had a wide base support gait; normal sensation, had a normal psychiatric affect; and tested positive for marijuana. (Tr. 397-98).

An MRI of the lumbar spine was performed on July 30, 2009. The scan revealed moderate facet arthrosis and disc bulging at L4-L5, resulting in bilateral lateral recess narrowing. (T p. 401). Plaintiff had a series of lumbar epidural steroid injections to alleviate the pain. (T p. 409)

A July 30, 2009, an MRI of her lumbar spine revealed no evidence of disc herniation or spinal stenosis; and moderate facet arthrosis and disc bulging at L4-L5, resulting in mild bilateral recess narrowing (Tr. 401).

On examination on August 13, 2009, Plaintiff reported complaints similar to her previous ones and showed similar results to her July examination, including normal straight leg raise testing and strength in her legs (Tr. 402-08). On August 28, 2009, Plaintiff received an epidural steroid injection for pain, and she was "discharged in excellent condition, walking with unchanged gait and without evidence of complications" (Tr. 409).

The last examination in the record is from September 10, 2009 at Pitt County by Dr. Johnson (Tr. 410-15). Plaintiff stated that she normally had an assistant help her with house work, but the assistant did not come the day before. As a result, Plaintiff suffered severe lower back pain after bending to take clothes out of the dryer and making her bed. Plaintiff's condition improved after her steroid injection (Tr. 410). Dr. Johnson encouraged her to try daily exercise and to take pain medication. (Tr. 415)

B. <u>Medical Evidence Relating to Plaintiff's Mental Impairments</u>

On August 9, 2006, consultative examiner Richard J. Bing, Ph.D., examined Plaintiff. Plaintiff said she was sexually abused by uncles during her childhood from ages 9 to 14, but avoids contact with her uncles and has not experienced any flashbacks for several years (Tr. 171, 361). She stated that she becomes very anxious and angry, particularly when she perceives a man to be negatively evaluating her. (Tr. 171-172). She stated that these symptoms did not interfere with her job when she had been working with patients one-on-one as a health aide, and only interfered when she encountered two or more men. (172-173).

Dr. Bing noted that Plaintiff was alert and oriented with adequate eye contact; had a restrictive, but not appreciably depressed affect; had no suicidal or homicidal ideation; had no hallucinations; answered several questions concerning memory and judgment; and had an estimated intellectual level in the low average to borderline range (Tr. 171-73). Dr. Bing assessed Plaintiff with a Global Assessment of Functioning (GAF) score of 55, indicating moderate symptoms. He diagnosed PTSD and depression. (Tr. 173).

Dr. Bing concluded that "[b]y her report, she may have difficulty in terms of certain work situations, particularly if there is a lot of people there and particularly men who tend to be certain. Given the totality of her difficulties, she may very well have a difficult time tolerating the stress and pressures associated with day-to-day work activity." (Tr. 174). Dr. Bing also concluded that Plaintiff demonstrated the ability to understand, retain, and follow instructions, to perform simple and repetitive tasks, and to manage her own finances (Tr. 174).

On August 14, 2006, Cal Vander Plate, Ph. D., performed a Psychiatric Review Technique (PRT) and a Mental Residual Functional Capacity Assessment based on Plaintiff's mental records (Tr. 183-200). He found that Plaintiff had mental impairments with moderate

limitations in the areas of activities of daily living, difficulties in maintaining social functioning, and maintaining concentration, persistence, and pace (Tr. 193, 197-98). Arlene M. Cooke, Ph.D., affirmed this assessment on reconsideration on November 1, 2006 (Tr. 211).

On April 17, 2007, Plaintiff was examined by Dr. Saman Hasan, M.D. at ECU Physicians (Tr. 213-16). Dr. Hasan found that Plaintiff exhibited mild symptoms of depression and Dr. Hasan increased her dosage of Zoloft. (Tr. 213-16). Dr. Hasan recommended therapy, and Plaintiff said she would consider it but lacked transportation.

Nearly one year later, Plaintiff sought mental health treatment from Albemarle Mental Health Center (AMHC), where she was examined Dr. Kalavathi Kolappa, M.D., and Licensed Clinical Social Worker Ann Morgan several times from March 5, 2008, to October 6, 2008 (Tr. 344-63, 378-83).

During Plaintiff's initial evaluation at AMHC on March 5, 2008, she complained of poor sleep and appetite, crying spells, hopelessness and helplessness, and flashbacks from sexual abuse (Tr. 361). She also reported financial hardship and relationship difficulties with her boyfriend. Dr. Kolappa assessed her with a GAF of 45, and she and Ms. Morgan found that Plaintiff was alert, cooperative, obese, and slow with movements; had a mildly depressed affect and depressed mood; had a good memory and fair judgment and insight; and had no psychosis or violent behavior (Tr. 362-63). She was diagnosed with recurrent and moderate major depressive disorder, as well as chronic PTSD. (Tr. 362). The doctors prescribed supportive psychotherapy and Zoloft.

Plaintiff started therapy with Ms. Morgan on March 19, 2008. (Tr. 360). On the same day, Dr. Kolappa saw the Plaintiff and reported that she was "slowly improving" with less

crying spells and better sleep and appetite, but she still had a dysthymic[3] affect and depressed mood (Tr. 359-60). By March 26, 2008, Plaintiff was improving and "doing better," including being alert, friendly, cooperative, smiling, and having good eye contact, appropriate affect to thought content, euthymic[4] mood, clear and coherent speech, no crying spells, and no side effects from medication (Tr. 358). Plaintiff also continued her individual therapy sessions with Ms. Morgan.

In April 2008, Plaintiff continued to improve, consistently having a euthymic mood, good eye contact, appropriate affect, clear and coherent speech, no evidence of psychosis or violent behavior, and no complaints of side effect from her medication (Tr. 352-57). Ms. Morgan indicated that problems with Plaintiff's self-esteem and assertiveness would likely be improved with future treatment (Tr. 356). Dr. Kolappa also indicated that Plaintiff's intake of caffeine right before she goes to bed was contributing to her sleep problems (Tr. 355).

On May 7, 2008, Ms. Morgan indicated that Plaintiff was feeling "good" (Tr. 351). Plaintiff continued to improve in May, as Dr. Kolappa indicated that she was "doing better" and Ms. Morgan stated that she was making progress on May 21, 2008 (Tr. 349-50). On June 11, 2008, Plaintiff continued to have similar findings of improvement (Tr. 347-48). On July 16, 2008, Dr. Kolappa stated that Plaintiff is "doing better" on her medication and noted that she observed "no evidence of any psychosis or depression" (Tr. 345). On July 30, 2008, Dr. Kolappa indicated that Plaintiff was still improving (Tr. 382). On August 27, 2008, Ms. Morgan indicated that although Plaintiff had problems listening, she was improving (Tr. 381). Also on that day, Dr. Kolappa stated that she was "doing well" and was improving with no evidence of depression (Tr. 380).

---

[3] Dysthymia is a mood disorder characterized by chronic mild depression.
[4] Euthymia is a state of mental tranquility and well-being; neither depressed, nor manic.

On September 19 and October 6, 2008, the last progress note entries from Plaintiff's mental health providers, Ms. Morgan indicated that Plaintiff got a lot of satisfaction from being a martyr. (Tr. 378-79). On November 6, 2008, Dr. Kolappa completed a check-form report that indicated that Plaintiff met Listing 12.04 (Tr. 383-84). Dr. Kolappa checked off that Plaintiff had the following depressive symptoms: anhedonia, appetite disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating. As a result of these symptoms, Dr. Kolappa checked off that Plaintiff has marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace. (T pp. 383-384). Dr. Kolappa did not discuss these findings on the form.

## C. Procedural History

Plaintiff protectively filed for disability under Titles II and XVI on June 8, 2006, alleging an onset date of December 28, 2001. The Agency denied Plaintiff's applications initially on August 14, 2006 (Tr. 48-49, 57-61), and upon reconsideration on November 2, 2006 (Tr. 50-51, 63-71). On February 26, 2009, Plaintiff appeared and testified at a hearing held before Administrative Law Judge Larry A. Miller (Tr. 11, 25-47).

### *1. The AJL's Decision*

At step one, the AJL found that Plaintiff was not engaged in substantial gainful activity since her alleged onset date (Tr. 13). At step two, he found that Plaintiff had a "severe" combination of impairments, including lumbar degenerative disc disease, carpal tunnel syndrome, degenerative joint disease in her knees, chronic obstructive pulmonary disease, obesity, sleep apnea, hypertension, major depressive disorder, post traumatic stress disorder and personality disorder (Tr. 14). At step three, he found that Plaintiff's impairments did not meet or

medically equal any Listing in Appendix 1, Subpart P, Regulation No. 4, including Listings 1.04, 1.08, 2.02-2.04, 4.02, 4.04, 6.02, 11.04, 12.04, 12.06, 12.08, and 14.09 (Tr. 14-15).

The ALJ determined that Plaintiff's allegations of the intensity, duration, and limiting effects of the symptoms caused by her impairments were not fully credible (Tr. 16-21). At step 4, he found that Plaintiff could perform light exertional work on a regular and sustained basis, including being able to: lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently; stand or walk, and sit for approximately 6 hours each in an 8-hour day; occasionally stoop, crouch, kneel, or crawl; and frequently perform fingering and handling tasks; and perform simple, routine, and repetitive tasks (Tr. 15). He also found that she was unable to work at a production rate or perform jobs that require complex decision, constant change or crisis situations, and that she should have no contact with the public and only occasional dealings with co-workers (Tr. 15). At step four, the ALJ found that Plaintiff, given her RFC, was unable to perform her past relevant work (PRW) (Tr. 22).

At step five, based on Plaintiff's age, limited education, work experience, RFC, and testimony from a vocational expert, the ALJ found that Plaintiff could perform several representative jobs, including office helper, photo copy editor, and shipping and receiving editor (Tr. 42-46). As a result, the ALJ determined that Plaintiff is not disabled under the Act on March 17, 2009 (Tr. 23-24).

The Appeals Council denied Plaintiff's request for review on May 24, 2010, and the ALJ's decision became the Commissioner's final decision (Tr.1-5). Plaintiff then requested review of that final decision pursuant to 42 U.S.C. § 405(g), and this Court held a hearing on this case on April 21, 2011.

## II. DISCUSSION

Plaintiff asserts that the ALJ erred in finding that Plaintiff's mental impairments did not meet listing 12.04. She also claims that the ALJ erred in finding Plaintiff had the residual functional capacity (RFC) to perform light work.

The Court finds that the ALJ committed no error and substantial evidence supports his findings. Plaintiff failed to meet her burden showing she met a statutory listing. The evidence also supports the ALJ's RFC assessment.

### A. Standard of Review

The Social Security Act defines "disability" as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." See 42 U.S.C. § 423(d)(1)(A).

In reviewing a final decision of no disability by the Social Security Administration Commissioner, the Court must determine whether the Commissioner's decision is supported by substantial evidence under 42 U.S.C. § 405(g), and whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law.

The Social Security disability analysis follows five steps. An ALJ must consider (1) whether the Plaintiff is engaged in substantial gainful activity, (2) whether the Plaintiff has a severe impairment, (3) whether the Plaintiff has an impairment that meets or equals a condition contained within the Social Security Administration's official list of impairments, (4) whether the Plaintiff has an impairment which prevents past relevant work, and (5) whether the Plaintiff's impairment prevents the performance of any substantial gainful employment. 20 C.F.R.§§ 404.1520, 1520a.

The Plaintiff bears the burden for steps one, two, three, and four, while the Defendant shoulders the burden for step five. If the Plaintiff shows by a preponderance of evidence that he has a statutory impairment under step three, he is conclusively presumed to have a disability and the analysis ends. Bowen v. Yuckert, 482 U.S. 137, 141 (1987). Alternatively, if the plaintiff fails to prevail under step three, she can still show she has an impairment that prevents her from continuing past work under step four. If so, the burden shifts to the Defendant to establish that the plaintiff is able to perform another job available in the national economy under step five. Id. at n. 5.

## B. Plaintiff's mental impairments do not meet Listing 12.04

Substantial evidence supports that Plaintiff's mental impairments do not meet the listed mental disorder 12:04, titled "Affective Disorder."

Affective Disorder is "a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." The required level of severity for these disorders is met when the requirements in both section A and B are satisfied.[5] The requirements in section A are "[m]edically documented persistence, either continuous or intermittent, of either Depressive syndrome or Manic syndrome. Depressive syndrome is characterized by at least four of the following:"

    a. Anhedonia or pervasive loss of interest in almost all activities; or
    b. Appetite disturbance with change in weight; or
    c. Sleep disturbance; or
    d. Psychomotor agitation or retardation; or
    e. Decreased energy; or
    f. Feelings of guilt or worthlessness; or
    g. Difficulty concentrating or thinking; or

---

[5] A Claimant could alternatively show affective disorder when the requirements in section C are satisfied. As the Plaintiff does not claim this, the Court will not discuss section C.

h. Thoughts of suicide; or

i. Hallucinations, delusions or paranoid thinking; or severe depression

Id. Manic syndrome is characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking; manic syndrome

Id.

Section B is satisfied when a claimant proves an impairment results in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

Id. "Marked" means more than a moderate, but less than an extreme limitation. 20 C.F.R. Part 404, Subpart P, Appendix 1, §12.00B.

Here, Plaintiff claims she qualifies for depressive syndrome in section A. She claims she has the following depressive symptoms: anhedonia, appetite disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating. As a result of these symptoms, Plaintiff states she satisfies section B through marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace. Plaintiff supports her argument with her diagnosis of depression and PTSD,

as well as a check-form report from her doctor. The AJL however, found that Plaintiff had failed to establish that her mental impairments were as severe as is required by the "B" criteria of Listing 12.04, as she had, at worst, moderate restrictions in the relevant areas of limitation (Tr. 15). The ALJ's determination is supported by substantial evidence.

The record shows that Plaintiff does not have marked limitations in maintaining social functioning or in maintaining concentration, persistence or pace. First, Plaintiff admitted to Dr. Bing in August 2006 that her mental symptoms have not interfered with her work activity. When Dr. Bing asked her if her "anxiety symptoms have ever interfered with work" Plaintiff said "no not when she was working with patients one-on-one, but if she encounters, for example, two or men [sic] particularly if they appear to have a negative evaluation of her, she does become highly anxious and angry." (Tr. 172-173).[6]

Additionally, Plaintiff's mental health significantly improved after she first sought mental health treatment at AMHC in March 5, 2008. Initially, Plaintiff complained of poor sleep and appetite, crying spells, hopelessness and helplessness, and flashbacks, and Dr. Kolappa assessed her with a depressed mood, a dysthymic affect, and a GAF of 45 (Tr. 361-63). But within a month, Plaintiff was "doing better" and had a euthymic mood without depression (Tr. 358). She also improved her eye contact and affect, and she had eliminated her crying spells (Tr. 358). From late March 2008 through October 2008, Plaintiff consistently maintained or improved her mental condition, including improving to a point where her doctor consistently stated that she was "doing better," had less or no crying spells, and/or presented no evidence of depression (Tr. 344-57, 378-82). There is not a single note evidencing any regression or inability

---

[6] The AJL specifically accounted for this problem in the RFC assessment, which stated Plaintiff should have no contact with the public and only occasional dealings with co-workers (Tr. 15).

15
Case 2:10-cv-00035-BO   Document 38   Filed 05/24/11   Page 15 of 20

to perform basic work-related activities.

Plaintiff nevertheless argues she has marked limitations in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace. The only support Plaintiff offers is the check-box form submitted by Dr. Koloppa on November 6, 2008. If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in a case record, it receives controlling weight. 20 C.P.R. § 404.1527(d)(2). "By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). Additionally, the ALJ is not bound by a treating physician's opinion regarding whether a claimant is disabled, as that opinion is reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(e)(1). 416.927(e)(1). Here, the ALJ correctly found that Dr. Koloppa's check-box form does not deserve controlling weight.

Form reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudicative process. See, e.g., Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996); Mason v. Shalala, 994 F.2d 1058, 1065 (3rd Cir. 1993); O'Leary v. Schweiker, 710 F.2d 1334, 1341 (8th Cir. 1993). Additionally, the form used by Dr. Koloppa is not the standard Agency form used by DDS Physicians to assess the functional abilities of claimants. Indeed, Dr. Koloppa's form only allowed for checking whether a claimant had certain symptoms, and whether her mental impairment caused functional limitations that were "marked" (Tr. 383-84). There was no space for, and Dr. Koloppa did not provide, any citation or reference to treatment notes or records, nor any explanation of how the physician arrived at her opinion. And as the ALJ noted, with no explanation or reasoning given for her findings, it is thus

impossible to determine if she knew and applied the relevant regulatory definition of "marked,"[7] or if she used some other definition (Tr. 21).

Moreover, the form's conclusions had no support in the medical record. Indeed, as the ALJ specifically found, Dr. Koloppa's November 2009 opinion is inconsistent with both Dr. Kolappa's own treatment notes, and the notes of Ms. Morgan, a social worker at her AMHC office (Tr. 21). The form report is thus insufficient for Plaintiff to carry her burden at step 3.

Therefore, the AJL correctly found that Plaintiff did not qualify for listing 12.04.

C. Substantial Evidence Supported the AJL's Residential Functional Capacity Assessment

Plaintiff argues the AJL erred in finding she had the Residential Functional Capacity (RFC) to perform light work. Plaintiff argues that the AJL did not adequately account for both her mental and physical impairments. Plaintiff's arguments are unpersuasive.

*1. Mental Impairments*

The ALJ included several limitations in Plaintiff's ability to perform light work, including several limitations related to Plaintiff's mental impairments. Specifically, the AJL found that Plaintiff could not work at a production rate and could not work with the public and only occasionally with co-workers. He also found Plaintiff could not engage in complex decision-making, constant change, or crisis situations, and he limited her to simple, routine, and repetitive tasks. Substantial evidence supports this RFC.

In August 2006, Dr. Bing found that Plaintiff had, at worst, moderate mental functional limitations, and assessed her with a GAF of 55 (Tr. 171-73). Dr. Bing stated that "[b]y her report, she may have difficulty in terms of certain work situations, particularly if there is a lot of people

---

[7] "Marked" means more than a moderate, but less than an extreme limitation. 20 C.F.R. Part 404, Subpart P, Appendix 1, §12.00B.

there and particularly men who tend to be certain. Given the totality of her difficulties, she *may very well have a difficult time tolerating the stress and pressures associated with day-to-day work activity.*" (Tr. 174)(emphasis added). Dr. Bing concluded that Plaintiff demonstrated the ability to understand, retain, and follow instructions, to perform simple and repetitive tasks, and to manage her own finances.

Dr. Bing's assessment is consistent with the rest of the record. Two separate state agents concurred with his conclusions, finding Plaintiff had only moderate limitations. On August 14, 2006, Cal Vander Plate found that Plaintiff had mental impairments with moderate limitations in the areas of activities of daily living, difficulties in maintaining social functioning, and maintaining concentration, persistence, and pace (Tr. 193, 197-98). Arlene M. Cooke, Ph.D., affirmed this assessment on reconsideration on November 1, 2006 (Tr. 211). Additionally, when Dr. Hasan, M.D. examined Plaintiff on April 17, 2007, she found that Plaintiff had only mild symptoms of depression. (Tr. 213-16). Plaintiff has never had any psychiatric hospitalizations (Tr. 361), and her hospital records concerning her physical impairments indicate that Plaintiff did not exhibit any mental impairments or emotional disturbances (Tr. 202, 206).

Plaintiff's own statements also support the ALJ's RFC finding. For example, Plaintiff told Mr. Bing that she briefly was paid to take care of children in her home and also cared for her godchildren. Plaintiff stopped caring for these children not because of any disability, but because she "didn't have the patience" to deal with them (Tr. 21, 172). She also told Dr. Bing that her mental impairments did not interfere with her taking care of patients while she was a home health aide. (17, 21, 172).

Dr. Koloppa is the only source finding that Plaintiff had marked mental impairments; as explained above, the ALJ correctly found Dr. Koloppa's assessment is entitled to little weight

18
Case 2:10-cv-00035-BO Document 38 Filed 05/24/11 Page 18 of 20

because it lacks medical support and is inconsistent with the rest of the record, including Dr. Koloppa own notes.

The ALJ properly took into consideration Plaintiff's documented mental impairments when formulating her RFC. Thus, substantial evidence supports the ALJ's conclusion that Plaintiff can perform light work with certain limitations.

### 2. *Physical Impairments*

The AJL also accounted for Plaintiff's physical restrictions in Plaintiff's RFC by limiting her to only light work. He found Plaintiff could lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently; stand or walk, and sit for approximately 6 hours each in an 8-hour day; only occasionally stoop, crouch, kneel, or crawl; and frequently perform fingering and handling tasks.

Nevertheless, the Plaintiff challenges these findings, relying on her own, subjective hearing testimony regarding her knee and back pain, as well as her statements in a doctor visit on September 10, 2009. Pl.'s Mot. at 11 (citing tr. 36-37, 42). The ALJ, however, found that Plaintiff's subjective statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible, and Plaintiff does not challenge this finding.

Additionally, Plaintiff's own statements as well as ample objective medical evidence show that Plaintiff is capable of light work with the above listed limitations. Despite her testimony that her pain never improved after surgery (Tr. 36), Plaintiff has repeatedly told doctors that her back and leg pain had significantly improved since her surgery (Tr. 21, 316, 368, 371). Plaintiff has also stated that "she can live with" her remaining back pain. (Tr. 375). Her doctors have repeatedly found that Plaintiff had normal (5/5) lower extremity strength and the ability to walk without difficulty (Tr. 21, 159, 171, 206-08, 316, 321, 328, 396-98, 402–08, 409,

414). Even during the September 2009 visit that the Plaintiff cites in her briefing, the doctor noted full muscle strength and only mild tenderness in the Plaintiff's lower back.

Thus, the ALJ's RFC finding is supported by substantial evidence.

### III. CONCLUSION

The ALJ committed no error in this case. Thus, the Government's Motion for Judgment on the Pleadings is GRANTED.

SO ORDERED, this _23_ day of May, 2011.

*/s/ Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE